Shackeleobd, J.,
gave the following dissenting opinion:
I cannot concur with my brother Judges, in their conclusions in this case.
It appears from the agreed statement of facts, the defendant, Blackman, had hired the negro woman and her son, Charles, for the years 1861, 1862 and 1863. In the year 1864, he was notified by the husband of Ellen, not to pay the hires to Gholson, but to pay them to her, which he did. This suit is brought to recover the hires of the year 1864, of the woman, Ellen, and her son, Charles. It appears, from the statement of facts, that the town of Clarksville, during the year 1864, was a military post, and occupied by the United States forces; that Blackman lived in the town of Clarksville, within the lines; that a large number of slaves came within the lines, and were under the control of the military authorities. It also appears, that plaintiff was, at one time, a soldier in the Confederate service; that one of the distributees of the intestate, for whom Ghol-son is the administrator, was also a soldier in that service. A part of the distributees are minors, and took no, part in the rebellion. It is now insisted, the legal status of the slaves was not changed by the war, so as to deprive the owner of recovering the hires, until they were emancipated, on the 22d of Eebruary, 1865.
It is insisted, the provisions of the Act of Congress, of July 17th, 1862, passed relative to slavery within the revolted States, is unconstitutional. Without stopping to discuss the constitutional provisions of that Act, and *593 bow far tbe law-making power of tbe Federal G-overnment bas tbe power to interfere with slavery in tbe States, it is unnecessary for me to discuss tbe constitutionality of tbe Act, as this case does not fall witbin its provisions, but is controlled and governed by international law, or tbe laws of war.
At tbe time of tbe biring of tbe slaves, in 1864, slavery was practically abolished in Tennessee. The government enlisted them in their armies, provided for tbe families of tbe males, and treated them as freedmen. The town of Clarksville was occupied by the military forces of tbe United States; a great number of slaves fled from their owners and took refuge witbin their lines. Within their lines, tbe slave found sure refuge and asylum, and was free from bis master’s control. Slavery existed in tbe State by tbe municipal law only. By tbe provisions of that law, be was regarded as a chattel, and also a human being. The owner held, under its provisions, a right of property in bis slave; be was liable to sale for bis debts; upon tbe death of tbe owner, he descended and vested in bis distributees. But this right of property existed under the local law only. The law of slavery originated in force; but it had become engrafted upon our social system, and previous to the war, the rights-of property in slaves was as secure as any species of personalty. Tbe attempt of tbe people of the State to throw off their allegiance to tbe government of the United-States, resulted in war; tbe consequences of which were, this species of property became contraband of war, and is, therefore, controlled by tbe principles of international law, and of tbe laws of war. The law of nature and of - *594 nations, Lave never acknowledged slavery. It was the result of force; and when the power that held him in bondage was removed or broken, his shackles fell from him.
“A slave stands in two relations to his master, and his master’s sovereign — that of an article of property, and that of a human being. As a movable chattel, by the laws of war, he would not be transferred from the private citizen to the occupying power, except as a contraband of war. A test could only be applied to males capable of military service, or of labor in time of war; but, as persons capable of being used by the will of the master, or his State, irrespective of his own will, in war, or as laborers, the occupying sovereign has the right to transfer their service from the enemy to himself. They are so directly liable to the State control, in war, that their conditions follow the fortunes of war; and, as slaves are grouped in temporary families, with rights at least moral, in the service, affection and duty one to another, the transfer includes the families, as appurtenant to the laborers. Their emancipation is as complete as their mere transfer would have been.” Dana’s Wheaton, 347, Note “A.” A war existed between the United States government, and the people of the States in rebellion. The executive and legislative departments of the government recognized a state of war. The revolted States were declared to be in insurrection to the lawful authority of the government of the United States. The whole military and naval power of the government was used to suppress it, and restore the lawful authority. Belligerent rights were accorded, *595 and the insurgents were treated practically as belligerents de facto. The people of the State of Tennessee had been declared to be in a state of insurrection to the Federal Government, and were regarded and treated as enemies. It can make no difference, whether the owner of the slave was loyal or disloyal, he resided within the enemy’s territory.
The Supreme Court of the United States, in the case of Mrs. Alexander Cotton, 2 Wallace, 419, say: “This Court cannot inquire into the personal character and dispositions of individual inhabitants of enemy’s territory. We must be governed by the principles of public law, so often announced from this bench, as applicable alike to civil and international wars; that all the people of each State, or district, in insurrection against the United States, must be regarded as enemies, until, by the action of the Legislature and Executive, or otherwise, that relation is thoroughly and permanently changed.”
Such being the status of the people of the State of Tennessee, as declared by the highest judicial tribunal of the land, on the 24th of April, 1863, instructions were prepared and issued for the government of the armies of the United States in the field, by order of the Secretary of War, by Francis Lieber, LL.D.; revised by a board of military officers, and approved by the President of the United States; and are known, in the series of orders issued, as No. 100. These instructions embody the principles of international law, and the laws of war, as recognized by the civilized nations of the earth. Section 42 of said instructions, on the sub *596 ject of slaves, is as follows: “Slavery, complicating and confounding tbe ideas of property, that is of a thing and a personality, that is of humanity, exists according to municipal, or local laws, only. The law of nature and nations has never acknowledged it.
“The digest of the Roman law enacts the early dictum of the pagan jurist, that so far as the law of nature is concerned, all men are equal. Fugitives, escaping from one country, in which they were slaves, villeins, or serfs, into another country, have, for centuries past, been held to be free by the judicial decisions of European countries, even though the municipal laws of the country in which the slave had taken refuge, acknowledged slavery within its own dominions. Therefore, in a war between the United States and a belligerent which admits of slavery, if a person held in bondage be captured by, or comes as a fugitive under the protection of, the military forces of the United States, such person is immediately entitled to the rights and privileges of a freeman.” Such being the rules of international law, as promulgated by the highest military authority of the Government, giving to these rules of law that broad and liberal construction that is always applied by the Courts in favor of human liberty, the slave of the belligerent, as soon as he comes within the lines of the United States forces, or they are extended over him, the chains that bound him are broken, and he stands forth “redeemed, regenerated and disenthralled,” a freeman, owing service only to his God and his country.
What is the legal effect of these principles upon the *597 right of the plaintiffs? The slaves, Ellen and her son, ■were hired by Owen Blackman for the year 1863. The hiring ceased at the close of the year; it was her duty to return to her master, by the law of slavery, as it existed previous to the war. If she refused, or failed to do so, having no written permission to stay in the town of Clarksville, or elsewhere, she was liable to an arrest and imprisonment as a runaway; but she was within the Federal lines; love of liberty prompted her to remain under the protection of the military authorities; and she, therefore, falls within the rules of international law. That superseded the local law, and she, thereby, became free. The rights of the owner ceased as soon as she placed herself and son under the protecting influence of the armies of the United States.
The laws of war recognized them as human beings, in which no right of property could exist. It follows, therefore, that the plaintiff had no right to the services of the negro, Ellen, and her son, for the year 1864, and is not entitled to recover. The conclusions of the Circuit Judge were correct, that the slaves were free, and I think the judgment, therefore, ought to be affirmed.